*Harlan* for plaintiff; *Cates* for defendant.

---

## Winston *vs* Gwathmey's Heirs, &c.

### ERROR TO THE UNION CIRCUIT.

*Vendor and vendee. Rescission. Conveyances. Evidence.*

CHANCERY.

*Case* 7.

*December* 10.

Case stated.

CHIEF JUSTICE MARSHALL delivered the opinion of the Court.

THIS bill was filed by Winston to obtain either a rescission of a contract for the purchase of land or an abatement of the price, and an injunction against two judgments for the purchase money. The original bill alledges as a ground for rescission, the want of a perfect derivation of title from the patentee to J. H. Gwathmey, by whom, through his attorney, Dallam, the contract of sale was made, and as a ground for abatement in the price, it alledges a deficiency in the quantity and disputes as to boundaries and possession. An amended bill filed shortly after the original, states as an additional ground for rescission or abatement, that a very valuable spring which had been shown to the complainant as a part of the tract before the purchase, turns out to be

a few feet outside of the true boundary, and it is alledg-
ed that this spring formed a material inducement to the
purchase, and that its loss, (there being but one other
permanent spring on the tract of more than 2,000 acres,)
will seriously impair the value of the tract. We shall
consider these grounds in the order in which they have
been stated.

1. As to title. The land was patented in 1796, to
Fontaine Maury, as containing 2,000 acres, surveyed
upon a military warrant, and deeds for the entire tract
are exhibited, first from Maury and wife to Hackley,
dated in 1797, and second, from Hackley to Rutherford,
dated in 1798, both recorded in the proper office in this
State, within eight months after their date. These
deeds not being certified as copies, appear to be originals
with the original certificates of acknowledgment and of
being recorded upon them. They are more than thirty
years old, and there has not only been no possession in-
consistent with them, but the possession of the land con-
veyed by them has been held under Rutherford and
those claiming from him, and therefore, under these
deeds ever since 1824, and for more than twenty years
before the trial of this case. Under these circumstan-
ces the deeds are admissible evidence of the transfer of
title to Rutherford, without any direct proof of their ex-
ecution by the male grantors, and without any aid from
the certificates of acknowledgment, one of which, (that
on the deed of Maury and wife,) is made by three Jus-
tices of the Peace, without any commission directed to
them, and the other from Hackley, by the Mayor of
Richmond, but apparently without any seal, official or
private. The bare possibility that after the lapse of 48
or 50 years since the date of these deeds, the wives of
the grantors may be living with an available right of
dower not barred by the possession held under Ruther-
ford, is not sufficient to create any difficulty as to title.

The deed from Rutherford and wife to J. H. Gwath-
mey, is also exhibited, bearing date the ———— day of
————, 1837, and certified by Joseph Tate, Mayor, and
Thomas Minn, Alderman, Justices of the Peace in and
for the city of Richmond, &c., with the certificate of

Title of vendor
stated. Deeds of
more than thirty
years standing
accompanied by
a possession du-
ring all that time
under the deed,
are admissible
without proof of
their execution,
and evidence of
title which a
vendee cannot
reject.

A certificate of
the acknowledg-
ment of a deed,
"before J. T.
Mayor, and J. M.
Alderman, Justi-

Chas. Howard, as Clerk of the Court of Hustings of the said city, with the seal of the Court annexed, attesting the character of Tate as Mayor, and Minn as Alderman, and of both as Justices of the Peace in and for said city. To which is added the certificate of Joseph Tate as Mayor of the said city, and presiding Justice of the Court of Hustings thereof, certifying the official character of Howard as Clerk, and that his attestation is in due form.

By the second section of the act of 1831, (1 *Stat. Law*, 451,) all laws requiring a commission to issue for taking the acknowledgment of *femes covert* out of this State, are repealed, and deeds thereafter acknowledged, &c., according to law, without commission, declared good. The certificate of acknowledgment in this case being in due form, the only question is, whether there is sufficient evidence that it was made by two Justices authorized by our laws to take and certify the acknowledgment of deeds. The circumstance that the two certifying officers call themselves and are certified to be Justices of the Peace in and for the city of Richmond, and not for any county, is not, in our opinion, material. The statutes, in speaking of the Justices of the Peace authorized to take acknowledgments of *femes* or of husband and wife, do not, it is true, recognize, in terms, a Justice of the Peace as a city officer, but speak of two Justices of the Peace of that county in which she dwelleth, "or two Justices of the Peace in the county where they reside." The officers to whom the power of taking the acknowledgment is given, are to be Justices of the Peace, and the reference to the county does not fix the style of office, but was intended to confine the performance of the act within the limits of their ordinary jurisdiction. A city might not be a part of any county, but might be an entirely separate territory for all purposes of local jurisdiction and action. In that case if there should be Justices of the Peace in and for the city, we should not doubt their authority under the statute. There might, in a particular State or country, be no local divisions called counties, as we believe is the case in Louisiana, where the local divisions are called Pa-

WINSTON
*vs*
GWATHMEY'S
HEIRS, &c.

ces of the Peace in and for the city of Richmond," with the certificate of C. H. as Clerk of the Court of Hustings for said city, with the seal of the court attesting the character of T. as Mayor and M. as Alderman, and of both as Justices of the Peace, and to which is added the certificate of J T. a Mayor of said city and presiding Justice of the Court of Hustings, certifying the official character of H. as Clerk of the Court of Hustings, and that the attestation is in due form, is a valid authentication since the statute of 1831, concerning conveyances. Two Justices of the Peace of a city or Parish have the same power as Justices of the Peace of counties.

rishes, but if there be Justices of the Peace, they have authority under our statute, to take and certify the acknowledgment of grantors within their territorial jurisdiction.

Our statutes do not prescribe the evidence by which the character and office of persons certifying as Justices of the Peace shall in such cases be established. The seal of the State would doubtless be sufficient to authenticate the fact, when certified from the Executive department of the State Government. But it has always been held in this court, that the certificate and official seal of the Clerk of the County Court of one of the counties of Virginia, was sufficient to establish the character of persons certifying deeds as Justices of the Peace in and for that county. And on the same principle, we are of the opinion that the certificate and official seal of the Court of Hustings of one of the cities of that State, is sufficient evidence of the official character of persons certifying as Justices of the Peace in and for that city.

It thus appears that the title of the land in question, was in Gwathmey, the vendor of Winston, or those claiming under him. And Gwathmey having by his will, read in evidence in this case, without objection, devised all the residue of his estate, after a few specific and pecuniary legacies to his sister, Mrs. Eleanor Taylor, a widow, we are of opinion that the title was in her, and may be passed by her deed, and certainly by the joint deed of herself and the executors of Gwathmey. And although the will of Gwathmey has not been recorded in this State, and is not, for the want of the seal of the Court to the Clerk's certificate, of its being proved and recorded in Virginia, so authenticated as to be admitted to record here, yet being read in evidence without objection, with the certificate upon it, there can be no question in this case of its having been actually proved and ordered to be recorded in Virginia, and that whenever it shall be deemed necessary, a copy can be obtained, properly certified and authenticated, to be admitted to record in this State, under the act of 1842: (3 *Stat. Law*, 585.) Whether the deed from Mrs. Tay-

lor and the executors of Gwathmey, as tendered in the answer is properly authenticated, it is not absolutely necessary to decide. The complainant is not in an attitude to require a conveyance, but only an exhibition of title. But we suggest a doubt whether the acknowledgment before two Justices was sufficient.

II. We are of opinion, therefore, that there is no defect of title to authorize a rescission of the contract. And as it appears by a survey returned in this case, that the land according to the patent boundaries, measures 2,281¾ acres, we are of opinion that the small deficiency below the quantity of 2,299 acres, mentioned in the contract of sale, being in fact less than one per cent., furnishes no ground even for an abatement in the price; and especially as by the terms of the written contract, the land though described in part by reference to the number of acres, appears to have been sold by the tract, or in gross, and not by the acre. There seems to be no disputed possession, nor in fact any adverse claim to any part of the land within the patent boundary.

III. With regard to the spring, which seems to be very valuable, and which is not in fact included within the boundary of the tract sold, the case is not free from difficulty. But upon the whole of the evidence relating to the subject, we are not satisfied that the spring formed a material element or consideration in the purchase. It seems indeed to have been shown to Winston as being within the tract, by an individual of the neighborhood, who had been requested by the agent of Gwathmey to show the land to persons desirous of purchasing. But the circumstances under which this request was made, and which Winston had the same means of knowing as of the request itself, indicated no other authority than that of showing the general body of the tract, and rather negatived the idea of an authority to exhibit the particular boundary. And not only was it generally believed in the neighborhood that the spring was not within the boundaries of this tract, but it was notoriously called and known as the Banks spring, from the name of the owner of the adjoining tract who lived within a very short distance, and who used the spring and kept

WINSTON
*vs*
GWATHMEY'S
HEIRS, &C.

A spring represented to be upon the tract of land purchased, which from its location and value, could not have formed a decided inducement to the purchase, being found to be without the purchsse will not authorize a rescission.

up a pen of rails around it. And this adjoining tract had been sold to Banks or his vendor as including the spring, by the very individual who was showing it to Winston. The spring had not been shown by this individual as being within this tract when a short time previous to Winston's looking at the land, his son and a son-in-law, together with the agent of Gwathmey, were taken through the tract by the same individual, who did not then pretend to be acquainted with, or to show the entire boundary of the tract. And it was when separating on this occasion, that this individual was requested, in presence of Winston's son, to show the land.

Conceding then, (although the fact is disputed and thrown into some doubt,) that the spring was shown to Winston before his purchase as a part of the tract, he had before him not only circumstances which might induce a doubt as to the fact, but also the ready means of further investigation and ascertainment. And if he had deemed the question as to the proprietorship of the spring, one of essential importance in view of his contemplated purchase, it is not to be presumed that he would have neglected these circumstances of doubt and means of ascertainment, on the bare representation of one who had been merely requested to show the land, and who, as his son knew, did not at that time profess to know the precise boundary. Then it does not appear that Winston was told, or knew at the time, that there was not an abundance of water and of springs on the land, or that he made any remark showing that any peculiar importance was attached to the locality of this spring. And it seems to be certain, that in the negociations which ensued for the purchase, he never mentioned it, and that the party negociating with him, not only made no representation with respect to it, but in fact knew nothing about it, both Gwathmey and his agent being in truth, and as Winston must have known, as ignorant of all particulars about the land, as he was, and probably more so. The only proof as to the value of the tract, is that it was worth at least as much without the spring as Winston agreed to give for it. And while there is nothing to authorize the assumption that

he would not have purchased at the price required, if he had known that the spring was not included, it may be assumed that the spring had nothing to do with the estimate placed upon the land by the vendor or his agent, and that, therefore, they would not have reduced the price if the true locality of the spring had been communicated to them. The inference deducible from these and other considerations which might be stated, that Winston either did not rely on the statement that the spring was in this tract, as true or as binding on the vendor, or that the statement, if believed, was not deemed important by him, and did not form an essential element of the contract or of the inducement to it, is sufficiently, and for the purposes of this enquiry, conclusively confirmed by the entire failure to say any thing about the spring in the original bill, (unexplained in the amendment,) and by the express prayer of the original bill, that if the contract should not be rescinded for want of title, &c., the complainant might be compensated for the deficiency, (to be produced by limiting the tract to the original patent boundary instead of the lines run upon a re-survey,) according to the average rate per acre for which the whole tract had been sold. He had known, long before, that the spring was included between the lines of the original and the subsequent survey. He claimed to have purchased by the lines of the subsequent survey, and yet in claiming compensation for the land to be thrown out of his purchase by reducing it to the true boundary, he claims nothing for the spring. It would scarcely add to the force of what has already been said, to state that he does not appear, at any time before filing his bill, to have made any complaint to the vendor or his agent, about not getting the spring, but that after full knowledge on the subject, he continued his payments and entered into new arrangements for securing them, soliciting further indulgence without expressing dissatisfaction, but promising full payment. And it was upon the denial of the indulgence asked for, that he filed his bill.

Upon the whole, we are of opinion that the objection on account of the spring, is an after thought, that the

spring did not enter originally into the terms or consideration of the contract, and that it should not now have any effect upon its execution. It follows, from the views taken, that there was no error in refusing either to rescind the contract or to abate the price upon the grounds alledged. But as the title of the vendor, Gwathmey, not being perfect upon paper, (by reason of the defective authentication of the two first deeds,) was perfected only by lapse of time after the suit was commenced, we are of opinion that Winston had cause to file his bill for an exhibition and perfection of the title, and to enjoin the judgments for the price; and that he ought not to have been subjected to damages upon the dissolution of the injunction.

Wherefore, the decree dismissing the bill without prejudice, is affirmed. But as to the dissolution of the injunction with damages, the decree is reversed, and the cause remanded with directions to dissolve the injunction without damages, and Winston is to have his costs in this Court.

*Harlan & Craddock* for plaintiff; *Morehead & Reed* for defendant.